Joanne BIMBO, Plaintiff,

v.

**BURDETTE TOMLIN MEMORIAL HOSPITAL, Defendant.**

Civ. A. No. 83–0793.

United States District Court, D. New Jersey.

Oct. 2, 1986.

Schwartz & Fioretti by Stacey L. Schwartz, Cherry Hill, N.J. and Kohn, Savett, Marion & Graf, P.C. by David H. Weinstein, William Lytton, Philadelphia, Pa., for plaintiff.

Horn, Kaplan, Goldberg, Gorny & Daniels, P.C. by William M. Honan, Atlantic City, N.J., and Valore, McAllister, Westmoreland, Gould, Vesper & Schwartz by Nina Chase, Northfield, N.J., for defendant.

COHEN, Senior District Judge:

Plaintiff, Joanne Bimbo, a registered nurse, instituted this civil rights action pursuant to Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq*, alleging retaliatory treatment by her former employer, Burdette Tomlin Memorial Hospital, Cape May Court House, New Jersey, ("BTMH" or "the Hospital") for her opposition to practices she perceived to be unlawful discrimination. In addition, plaintiff asserts pendant state law claims, alleging breach of contract and wrongful discharge.[1] She seeks compensatory damages, back pay, and reinstatement.

---

**1.** Plaintiff's complaint was deemed amended to include the pendant breach of contract claim by a ruling of this Court. *See* slip op. of April 28, 1986 at p. 12.

The record in the case was supplemented, by stipulation of counsel, *see* transcript of July 31, 1986 at pp. 10–11, with the record of the nine-week jury trial in *Nanavati v. Burdette Tomlin Memorial Hospital, et al*, Civil Action Nos. 83–0794 & 84–1790 (hereinafter *"Nanavati* trial"), in which Ms. Bimbo testified on behalf of Dr. Suketu Nanavati. In lieu of specific findings of fact and conclusions of law, we issue this opinion pursuant to Federal Rule of Civil Procedure 52(a).

Plaintiff was employed by BTMH in its nursing department from July, 1972 until March 18, 1982. She served as Head Nurse of the hospital's intensive care unit ("ICU") for five years, from February 1, 1977 until February 18, 1982, at which time she was demoted from ICU Head Nurse to staff nurse. Plaintiff was informed, at the time of her demotion, that she could not serve as a staff nurse in the ICU but that she could do so in any other department in the Hospital. Immediately thereafter, plaintiff left BTMH on a previously-planned vacation. While on vacation, she tendered her resignation, informing Ms. Teresa Karter, BTMH's Directress of Nursing at that time, that she would not be returning to BTMH because her demotion made such a return untenable. Exhibit 5014.

On June 8, 1982, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been demoted in retaliation for her support of a minority physician, Dr. Suketu H. Nanavati. *See* plaintiff's Exhibit 6016. Dr. Nanavati, a board-certified cardiologist and a native of Ahmedabad, India, became a member of the BTMH Medical Staff in March, 1979. Shortly thereafter, a personal and professional feud erupted—a feud ignited by Dr. Nanavati's reference to Dr. Sorenson, in the presence of the entire BTMH Medical Staff, as "inferiorily qualified"—between Dr. Nanavati and Dr. Robert J. Sorenson,

the Chief of Cardiology at BTMH.[2] At a fairly early stage in this feud, *see* transcript of *Nanavati* trial, May 22, 1986 at pp. 49–50, Dr. Sorenson orally accused plaintiff and other nurses present in the ICU of being "Indian lovers," an outburst for which he subsequently apologized to only one of the nurses, which apology, it may be assumed, was related to the other nurses. At some point thereafter, plaintiff, having received, apparently by virtue of her position as Head Nurse of the ICU, as did other Head Nurses and Departmental heads, copies of correspondence from various persons, including Dr. Sorenson, complaining about Dr. Nanavati, wrote a letter to Dr. Marvin Podolnick, the Chief of the hospital's Medical Staff. That letter, dated January 9, 1982 but which was apparently not actually mailed until approximately the third week of January, *see* transcript of *Nanavati* trial, May 22, 1982 at p. 56, reads as follows:

> This letter is written in response to several letters I have received copies of over the past months. They concern an incident involving Dr. Suketu H. Nanavati and a Monitor Bed Unit staff member.
>
> First, let me say that in 9 years of employment at Burdette Tomlin Hospital I've never found myself involved in something so unprofessional. Secondly, I don't feel I should have received copies of these letters—frankly, it was none of my business. However, an issue does concern me very much it seems to me that emotions are taking precedent over *our* actual purpose, that is to provide the highest quality of patient care possible to the people of Cape May County.
>
> The ICU staff recently held our monthly "staff" meeting where this issue was discussed. We discussed the main issue of the prior mentioned letters. The differences Dr. Nanavati may have with some of the MBU staff is again, frankly, none of our business. I must add a

---

**2.** The precise nature of and reasons for this feud, and the legal ramifications thereof, are the subject of lawsuits between these doctors and the hospital. These actions, Civil Action Nos. 83–0794 & 84–1790, were consolidated and tried before a jury for nine weeks in the case previously referred to herein as the *Nanavati* trial.

personal note here. I have known Dr. Nanavati since he came to Burdette Tomlin about 3 years ago. I have always felt I have an excellent working relationship with all members of the medical staff, here at Burdette. Dr. Nanavati has been no exception. Intensive care usually provides an environment of constant stress, emergencies, grief and grieving, and the need for a vast array of knowledge for quick problem solving for a staff member there. Dr. Nanavati has always been supportive of the ICU staff. He is always eager to teach and answer quiestions (sic) we may have regarding care of our patients.

In my opinion, his patients get the most optimum medical care. I have gone on ambulance runs with his critical patients to other institutions where his diagnosis and care of the patient while at Burdette was met with the highest regard by the physicians there. I nor any of my staff members in ICU have ever been chastised nor ridiculed by Dr. Nanavati. I feel this is important to write since there seems to be so much negativism about Dr. Nanavati lately.

I sincerely hope my feelings will be respected. May I add that the rest of my staff feels this way also.

Lastly, I sincerely hope a professional and healthy solution comes of all this for everyones' well-being.

Within a month of sending this letter, plaintiff was informed, at her annual performance evaluation, that she was being removed from her position as Head Nurse of ICU. *See* transcript of *Nanavati* trial, May 22, 1986 at pp. 59–67.

The reasons given to plaintiff for her demotion included: excessive lateness, failure to attend Head Nurse Workshops or tardiness in attendance, failure to expedite transfers of patients to and from the ICU, failure to attend staff scheduling workshops, and failure to timely submit nursing staff schedules. Plaintiff asserts, in her present action, that these reasons were merely a pretext for demoting her. She maintains that the true reason for the Hos-

pital's decision to demote her was her support of Dr. Nanavati, as evidenced by her January 9, 1982 letter and her sustained cooperative working relationship with him. *See* plaintiff's reply summation at p. 4. She further contends that the decision to demote her, and the repercussions of that decision, amounted to a constructive discharge because such decision rendered working conditions at BTMH so intolerable that a reasonable employee would have been forced to resign. Such a discharge, plaintiff argues, was either in retaliation for her support of Dr. Nanavati, as a minority, in violation of Title VII of the 1964 Civil Rights Act, or for her support of Dr. Nanavati as a person against whom the Hospital was committing allegedly illegal or improper acts, in contravention of state law. Finally, plaintiff urges that the procedures employed in effectuating her demotion, irrespective of the true reasons therefor, ran afoul of an implied employment contract she held with the Hospital. We shall consider each of plaintiff's contentions in turn.

### Retaliatory Treatment for Opposition to Unlawful Discrimination

 Plaintiff's federal claim is one for protection against retaliation for opposition to unlawful discrimination, pursuant to § 704(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a). This statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

In order to prevail on an action pursuant to this section, the plaintiff must establish three elements. First, she must show that she engaged in some statutorily protected opposition to discrimination; second, that there was some adverse employment ac-

tion; and finally, that there was a causal connection between her opposition and the adverse employment action. *E.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). *See generally* B. Schlei & P. Grossman, *Employment Discrimination Law* 533, 534 (2d ed. 1983). Because we find that there was no causal connection between plaintiff's opposition to whatever practices or actions she perceived as discriminatory and her demotion, we shall enter judgment in favor of the defendant, BTMH, on plaintiff's Title VII claim.[3]

■ The sole item of proof supporting plaintiff's allegation that her demotion was caused by her opposition to unlawful discrimination is the timing of the letter she wrote to Dr. Podolnick in relation to the date of her discharge. Although, of course, a preliminary inference of causation can be drawn from the fact that Ms. Bimbo's demotion occurred shortly after she sent the January 9 letter, this inference was unequivocally overcome in this case by the defendant's proof of a legitimate non-discriminatory reason for its action. The submitted proofs included highly credible testimony by both the former Directress of Nursing, who had actually made the decision to demote plaintiff, Ms. Karter, and the Associate Directress of Nursing at BTMH, Ms. Doris Baker. These witnesses testified, *inter alia*, that the reasons given to plaintiff for her demotion were in fact problems perceived well in advance of her letter to Dr. Podolnick and that numerous conversations with plaintiff were held over a considerable period of time apprising her of the perceived need for improvement with respect to these elements of her job performance. The evidence further showed that plaintiff was, in fact, late for work at least 104 times in the calendar year immediately preceding her demotion,[4] a figure greater than twice the number of times plaintiff had been late in previous years.

After careful consideration of all of the evidence, we are convinced that the Hospital's decision to demote plaintiff was based entirely on legitimate business reasons. The Hospital has demonstrated, as a factual matter, plaintiff's repeated failure to report to work on time, despite numerous attempts by the Hospital to accomodate the scheduling demands of plaintiff's personal concerns. Such a record of tardiness, particularly when displayed by the Head Nurse of an Intensive Care Unit which requires some overlap in nursing personnel in order to convey essential information regarding patient care, was understandably intolerable to the employer hospital. We find that there was no retaliatory motive on the part of the defendant in its demotion of plaintiff, and we find no causal connec-

3. Our finding that no causal connection existed between plaintiff's demotion and her alleged opposition to discrimination obviates the need for rulings on two significant points of contention between the parties herein. The first of these issues is the question whether the practice opposed by the person aggrieved by the alleged § 704(a) violation must be in fact and in law a violation of Title VII. This issue arises in relation to the first element of plaintiff's case by virtue of the fact that the individual whom plaintiff asserts she was defending was held not to have a viable Title VII claim, as a matter of law. *See Nanavati v. Burdette Tomlin Memorial Hospital, et al,* C.A. Nos. 83–0794 & 84–1790 slip op. at 3–10 (D.N.J. June 23, 1986). The second issue, the question whether plaintiff's demotion amounted to a constructive discharge, bears upon the type of relief to which plaintiff might be entitled. The standard to be applied in determining whether an employer's acts of discrimination constitute a constructive discharge for Title VII purposes was recently discussed by the Third Circuit. In *Goss v. Exxon Office Systems Co.,* 747 F.2d 885 (3d Cir.1984), the court held that no finding of specific intent by the employer to bring about a discharge was required to invoke the constructive discharge doctrine, but that a court "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* at 888.

4. This figure was based on BTMH's payroll policy regarding lateness, which provides for a 12–minute grace period—a 12–minute time span after the commencement of an employee's scheduled shift—before an employee is considered late. According to BTMH's "nursing policy" with respect to tardiness, which grants no grace period, plaintiff was late for work 171 times in 1981. *See* tr. of August 4, 1986 at pp. 66–68. The latter figure represents 67% of the total number of plaintiff's paid work days for that year. *Id.*

tion between plaintiff's demotion and her actions with respect to Dr. Nanavati. Accordingly, we shall enter judgment in favor of the defendant, BTMH, on plaintiff's Title VII claim.

### Wrongful Discharge

 Plaintiff maintains that her demotion, which she argues amounted to a constructive discharge, was in violation of public policy as reflected in Title VII of the Civil Rights Act of 1964 and the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* Accordingly, plaintiff urges, her demotion was a "wrongful discharge" entitling her to relief without regard to the existence, or lack thereof, of an employment contract.

In *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505 (1980), the New Jersey Supreme Court adopted a public policy exception to the common law rule known as the "at will doctrine." This doctrine provides that, in the absence of an employment contract, employers are free to terminate an employment relationship without cause. The *Pierce* court, balancing the interests of the employer, his employees, and the public, recognized a cause of action, in tort or contract or both, *id.* at 72, 417 A.2d 505, to provide a remedy for employees who are wrongfully discharged. The court held that an employee has such a cause of action when the discharge is contrary to a clear mandate of public policy. *Id.*

Accepting, *arguendo*, plaintiff's contentions that her demotion amounted to constructive discharge, we nonetheless do not find that plaintiff is entitled to prevail on her wrongful discharge claim. The evidence in this case simply does not support a finding that plaintiff's "discharge" was contrary to public policy.

Plaintiff urges this Court to find that her "discharge" was contrary to public policy because it was motivated by a desire to punish her for her support of Dr. Nanavati, against whom, she maintains, the Hospital

was either discriminating or was committing an antitrust violation.[5] Assuming, without deciding, that some unlawful actions were taken by the Hospital against Dr. Nanavati, we are still without proof that such actions, or plaintiff's reactions thereto, were related, in any way, to plaintiff's "discharge." The evidence in this case clearly demonstrates that plaintiff was demoted for legitimate business reasons, and not by reason of some desire to penalize her. There is no evidence to support her claim that her demotion was, in any respect, violative of a public policy. There was no constructive discharge here. The Hospital had valid reasons for relieving her of her administrative duties. No problem was found with her ability as a nurse. Every opportunity was afforded her to continue her relationship with the Hospital as a staff nurse in any department of her choice. She was not discharged. She resigned. Accordingly, we shall enter judgment in favor of defendant, BTMH, on plaintiff's pendant wrongful discharge claim.

### Breach of Contract

 Plaintiff's final contention is that BTMH, by the manner in which it demoted her, materially breached its employment contract with her. In so arguing, plaintiff relies not on an individual written employment contract, but upon BTMH's "Personnel Policies and Administrative Practices" brochure, ("personnel policy manual"), Exhibit 6000, and recent New Jersey case law which recognizes the existence of a cause of action for breach of contract based upon implied promises in an employment manual.

The BTMH policy manual states, in pertinent part:

### COUNSELLING AND PROGRESSIVE DISCIPLINE PROCEDURE

If an employee violates hospital policy that is not considered a cause for imme-

---

**5.** The jury in the *Nanavati* case, Civil Action Nos. 83–0794 & 84–1790, found that the Hospital had not engaged in racial discrimination against Dr. Nanavati, but had participated in a contract, combination or conspiracy in restraint of interstate commerce which harmed him.

diate dismissal, it is the procedure of the hospital to counsel that employee through the progressive discipline system as follows:

### First Offense

The Department Head or Supervisor will discuss the policy infraction with the employee on a verbal basis.

### Second Offense

Will be documented in writing, reviewed and acknowledged by the employee's signature on the employee counselling form. This will be filed in the personnel jacket.

### Third Offense

Will be documented in writing, reviewed and acknowledged by the employee's signature on the employee counselling form. The third offense could result in probation; suspension; (both); or termination. A written warning will be removed and destroyed providing there were no other policy infractions within two years from the date of the warning.

Plaintiff, contending without rebuttal that she was not provided with any *written* documentation of her infraction of the Hospital's policy regarding excessive and repeated tardiness, prior to her demotion, urges that a material breach of these provisions occurred upon her demotion. This, she argues, constituted a breach of contract, entitling her to relief.

Plaintiff's contention that the policy manual constituted an employment contract rests upon an application of *Woolley v. Hoffmann-La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985), in which the New Jersey Supreme Court held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual

that an employee will be fired only for cause may be enforceable against the employer even when the employment is for an indefinite term and would otherwise be terminable at will." *Id.* at 285–86, 491 A.2d 1257. Because we hold that the *Woolley* decision is not applicable to the case at bar,[6] we shall enter judgment in favor of defendant, BTMH, on plaintiff's breach of contract claim.

In its 1985 *Woolley* decision, the New Jersey Supreme Court held that the legal effect of the dissemination of a personnel policy manual by a company with a substantial number of employees should be determined by traditional contract doctrine. 99 N.J. 284, 289. In so holding, the *Woolley* Court, to the extent it went beyond ruling only that fundamental principles of basic fairness must be adhered to in employment relationships, *id.* at 309, 491 A.2d 1257, *see also Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980), clearly broke new ground in New Jersey employment law. As such, the *Woolley* decision, in our opinion, should not be applied retroactively. *E.G., Spiewak v. Rutherford Board of Education,* 90 N.J. 63, 447 A.2d 140 (1982). To apply such a significant change in the law retroactively would be distinctly unfair to those effected thereby who had previously acted in reliance upon the prior state of the law. *See, e.g., Buono v. Board of Trustees of Teachers Pension and Annuity Fund,* 188 N.J. Super. 488, 457 A.2d 1214 (App.Div.1983).

In the present case, the operative facts giving rise to plaintiff's complaint—her demotion in February of 1982—occurred more than three years before the New Jersey Supreme Court's decision in *Woolley.* Accordingly, in light of our holding that *Woolley* is not to be applied retroactively,

---

**6.** If the *Woolley* decision were to be applied retroactively to the instant case, significant issues would be presented with respect to whether plaintiff, who was a managerial employee, and who was demoted from an administrative position rather than discharged from employment, would be entitled to the procedural safeguards set out in the manual. Moreover, a substantial question would arise regarding whether *Woolley*

was intended to be limited to the factual situation where an employee receives no actual notice of poor job performance. In this case, the facts clearly illustrate that the purpose of the notice requirement—to allow the employee the opportunity to improve performance—was satisfied by the Hospital's repeated attempts to solve the problems with Ms. Bimbo's administrative failings.

plaintiff herein, in the absence of an individual employment contract, has no cause of action for breach of contract. We shall therefore enter judgment in favor of defendant BTMH on plaintiff's breach of contract claim.