**Tracie WASHINGTON, Appellant,**

v.

**GUEST SERVICES, INC., Appellee.**

**No. 96–CV–997.**

District of Columbia Court of Appeals.

Argued April 1, 1998.

Decided Sept. 17, 1998.

A. Palmer Ifill, Washington, DC, for appellant.

Stephen B. Foreman, with whom Jennifer R. Pitarresi, Washington, DC, was on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and KING, Associate Judge, Retired.*

SCHWELB, Associate Judge:

 This appeal presents two important questions regarding the application of our recent decision in *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C.1997) (en banc) (*Carl II* ), in which we expanded in some measure the circumstances under which an "at will" employee may recover against his or her employer in an action for wrongful discharge. Specifically, we must decide

1. whether the standard articulated in *Carl II* applies retroactively to cases in which the complaining employee was discharged prior to September 23, 1997 (the date on which *Carl II* was decided); and, if so,

2. whether, under *Carl II*, Tracie Washington's sworn allegation that she was discharged in retaliation for attempting to ensure compliance by a fellow employee with District of Columbia health and food regulations was sufficient to preclude entry of summary judgment against her.

We answer both questions in the affirmative.

## I.

### THE FACTS

A. *The plaintiff's account.*

In September 1994, Tracie Washington was employed as a dietary aide and cook at the Friendship Terrace Retirement Home in northwest Washington, D.C. The home housed approximately two hundred elderly residents, and its dining room and kitchen were operated by Guest Services, Inc. This case arises from the involuntary termination

of Ms. Washington's employment on September 9 of that year.

The circumstances which allegedly led to Ms. Washington's discharge are described in an affidavit which she filed in opposition to Guest Services' motion for summary judgment, and also in Ms. Washington's pretrial deposition. Briefly, Ms. Washington claims that on September 8, 1994, she was preparing a meal for the residents of the home when a fellow worker, Tyrica Martin, began spraying stainless steel cleaner in the area where Ms. Washington was cooking. Ms. Washington stated in her affidavit that "[t]he spray is poisonous and if it comes into contact with food it renders the food unwholesome and unfit for human consumption." She asserted that "where I stood I could feel the spray on me and I could see the spray entering the food I was preparing." Ms. Washington claimed to have been especially concerned about potential contamination of the food because many of the residents of Friendship Terrace were in ill health.

According to Ms. Washington, "[t]he law requires that I not prepare nor serve food unless it is appropriately protected from . . . contamination." Therefore, in an effort to obey the law, Ms. Washington "told to [Ms. Martin] to stop spraying. To me this was a health emergency."

The events that followed were described by Ms. Washington in her affidavit:

12. The manager heard what I told the employee and called me into his office and told me that when he tells an employee to do something, I do not have the authority to tell the employee not to do it. He stated that he told the employee to spray, and that by me telling the employee to stop spraying that this was insubordination.

13. I explained to the manager that the spray was entering into the food and that the employee was spraying next to open food which was being cooked.

14. The manager accused me of insubordination. He told me to go home. I went

---

* Judge King was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1998.

home and when I returned to work the next day I was fired for insubordination. 15. The insubordination I was fired for was for telling the employee to not spray into and around and near the food I was preparing. This was the only act of insubordination I was told that I committed or that I was aware of.

## B. *The lawsuit.*

On February 13, 1996, Ms. Washington filed a complaint against Guest Services, Inc., alleging that her discharge was wrongful. Ms. Washington claimed that her co-worker's conduct in spraying the food with cleaning fluid contravened applicable District of Columbia health and food regulations,[1] and that Guest Services had dismissed her (Ms. Washington) "for protesting safety, health, and food code violations on the part of the defendant."

On June 17, 1996, Guest Services filed a motion for summary judgment. Guest Services argued that Ms. Washington was an at-will employee[2] and that her allegations, even if true,[3] did not bring her within the only public policy exception to the at-will employment doctrine that had been recognized by this court at the time. *See Adams v. George W. Cochran & Co.,* 597 A.2d 28, 34 (D.C.1991) (holding that an at-will employee may not be discharged for refusal to violate the law).

On July 23, 1996, the trial judge granted Guest Services' motion for summary judgment. He held that Ms. Washington

> had no legal obligation to prevent food from being contaminated or to complain

about others contaminating food. Rather, her obligation was not to prepare or serve unfit food. [Guest Services] did not put her to the choice of disobeying that obligation as the price for keeping her job.

On July 26, 1996, Ms. Washington filed her notice of appeal.

## C. *The appeal.*

Ms. Washington and Guest Services filed their initial briefs in this court on May 8, 1997 and June 3, 1997 respectively. In their submissions, the attorneys debated the question whether Ms. Washington's allegations, if credited, brought her situation within the *Adams* exception to the at-will doctrine. The case was scheduled for submission without oral argument on November 4, 1997. The appeal was thus still pending on September 23, 1997, when the en banc court issued its decision in *Carl II.*

On December 18, 1997, recognizing that *Carl II* had added a potential new dimension to Ms. Washington's appeal, this division issued an interim order. *Washington v. Guest Servs., Inc.,* 703 A.2d 646 (D.C.1997) (per curiam) (*Washington I*). We held in *Washington I* that the trial judge had properly granted Guest Services' motion for summary judgment under the law as it existed prior to *Carl II.* We further directed counsel to submit their views as to whether the law as enunciated in *Carl II* applies to the present appeal and, if so, whether the entry of summary judgment in Guest Services' favor remained appropriate.[4] Having considered the parties' supplemental written and oral submissions, we now hold that although the trial

---

1. *See, e.g.,* 23 DCMR § 2101.1 (1990) ("No person shall dispense, ... prepare, [or] process ... food unless it be appropriately protected from deleterious aerosol...."); 23 DCMR § 2200.2 (1990) ("No person shall work or be allowed to work in any capacity ... [w]hen the person does not use hygienic work practices."); 23 DCMR § 3010.1 (1990) ("All food and drink shall be wholesome [and] unadulterated...."); *cf.* D.C.Code § 22–3416 (1996) ("No person shall sell, or cause to be sold, or offer for sale any food which is unwholesome or unfit for use.").

2. Under the "at-will" employment doctrine, in the absence of an applicable statute or public policy exception, "an employer may discharge an at-will employee at any time and for any reason,

or for no reason at all." *Carl II, supra,* 702 A.2d at 162 (Terry, J., concurring).

3. Guest Services asserted that, in fact, Ms. Washington's allegations were not true. Guest Services claimed that, if the case were to go to trial, the evidence would show that Ms. Washington was fired "because she screamed, shouted, cussed and swore, when Supervisor Johnson asked her to come into his office to talk with her, and that she was fired for her rudeness, vulgarity and refusal to clock out when she became hysterical, as well as for her prior work history."

4. We also asked counsel to state their positions as to whether the case should be remanded to the trial court in light of *Carl II.*

judge's decision correctly reflected the case law at the time the motion was decided, the basis for his ruling has been superseded by *Carl II*.

## II.

### RETROACTIVITY

We first consider the question whether the modification of the at-will doctrine adopted by the en banc court in *Carl II* applies to cases in which the plaintiff was discharged prior to September 23, 1997. We hold that it does.

### A. *Mendes v. Johnson.*

 As a general rule, statutes operate prospectively, while judicial decisions are applied retroactively. *United States v. Security Indus. Bank*, 459 U.S. 70, 79, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). When, as in *Carl II*, a decision of this court articulates a new rule of law, "it is our duty to apply its holding to this case unless equitable considerations require a different result." *Tenants of 2301 E St. N.W. v. District of Columbia Rental Hous. Comm'n*, 580 A.2d 622, 628 (D.C.1990) (citing *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801)). In such cases, we must presumptively apply the law as it exists at the time of our decision, even though the trial judge's disposition was correct at the time of his ruling. *Id.*

The leading District of Columbia case addressing the circumstances under which judicially-crafted changes in the common law are to be retroactively applied is *Mendes v. Johnson*, 389 A.2d 781 (D.C.1978) (en banc). In *Mendes*, the en banc court, overruling prior precedent, held that a tenant may not be evicted from his or her leasehold except by lawful process, and that a landlord who uses self-help to effect the physical dispossession of the tenant is liable in tort for wrongful eviction. *Id.* at 783–87. Turning to the question whether the new rule announced by the court should be applied retroactively, the court adopted the Supreme Court's then-current jurisprudence, as articulated in *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). The Supreme Court

had stated in *Linkletter* that, as a matter of constitutional law, it was neither required to apply a decision retrospectively nor prohibited from doing so. According to *Linkletter*,

> we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

*Id.* at 629, 85 S.Ct. 1731; *see also Mendes*, 389 A.2d at 788 (quoting *Linkletter*).

In *Mendes*, in conformity with the "broad guiding principles of *Linkletter*," the court adopted a four-point analytical framework for determining whether, and to what extent, a decision overruling prior precedent should be applied retroactively. This framework included

> (1) the extent of the reliance of the parties on the old rule (including the degree of justifiable reliance and the hardship which might result to the litigants as a result of retrospective application); (2) avoidance of altering vested contract or property rights; (3) the desire to reward plaintiffs who seek to initiate just changes in the law; and (4) the fear of burdening the administration of justice by disturbing decisions reached under the overruled precedent.

389 A.2d at 789. Analyzing these criteria, the court held in *Mendes* that the new rule should be given only "partial retroactive effect, *i.e.*, [it] will apply to the instant parties as well as prospective application." *Id.* at 792.

### B. *Beam and Harper.*

*Mendes v. Johnson* was decided twenty years ago. In the intervening years, the Supreme Court has discarded its previous approach to retroactivity—the very approach on which this court based its decision in *Mendes*.

In 1987, *Linkletter v. Walker*, the principal authority upon which *Mendes* was based, was explicitly overruled. *See Griffith v. Kentucky*, 479 U.S. 314, 322–23, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that all "newly declared" rules must be applied retroactively to all criminal cases pending on direct review). The Court explained in *Griffith* that

the task of making rules of law "on a broad basis" is a legislative one, and that the nature of judicial adjudication requires that the Court adopt new rules in the context of specific cases. *Id.* at 322, 107 S.Ct. 708. The Court also concluded that "selective application of new rules violates the principle of treating similarly situated [parties] the same." *Id.* at 323, 107 S.Ct. 708.

Since *Griffith,* the rule of retroactive application has been explicitly extended to civil cases. In *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), a majority of Justices agreed that a rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law. *See id.* at 540, 111 S.Ct. 2439 (opinion of Souter, J.); *id.* at 544, 111 S.Ct. 2439 (opinion of White, J.); *id.* at 548, 111 S.Ct. 2439 (opinion of Marshall, J.); *id.* at 548–49, 111 S.Ct. 2439 (opinion of Scalia, J.). In *Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993), the Court expanded on *Beam* as follows:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. This rule extends *Griffith*'s ban against "selective application of new rules." 479 U.S., at 323 [107 S.Ct. 708]. Mindful of the "basic norms of constitutional adjudication" that animated our view of retroactivity in the criminal context, *id.,* at 322 [107 S.Ct. 708], we now prohibit the erection of selective temporal barriers to the application of federal law in

non-criminal cases. In both civil and criminal cases, we can scarcely permit "the substantive law [to] shift and spring" according to "the particular equities of [individual parties'] claims" of actual reliance on an old rule and of harm from a retroactive application of the new rule. *Beam, supra,* at 543 [111 S.Ct. 2439] (opinion of Souter, J.). Our approach to retroactivity heeds the admonition that [t]he Court has no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently.[5]

The Court also stated that "the federal law applicable to a particular case does not turn on whether [the] litigants actually relied on an old rule or how they would suffer from retroactive application of a new one." *Id.* at 95 n. 9, 113 S.Ct. 2510 (citation and internal quotation marks omitted).

### C. *M.A.P. v. Ryan.*

■ The rule is fundamental in our jurisprudence that "no division of this court will overrule a prior decision of this court." *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971) (footnote omitted). Overruling our precedents can be effected only by this court en banc. *Id. Mendes v. Johnson,* itself an en banc decision, is thus presumptively binding on us.

"We do not believe, however, that *M.A.P. v. Ryan, supra,* obliges us to follow, inflexibly, a ruling whose philosophical basis has been substantially undermined by subsequent Supreme Court decisions." *Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C.1979). Arguably, *Beam* and *Harper* have "substantially undermined" our reliance, in *Mendes,* on the Supreme Court's former approach to retroactivity issues, as

---

5. The Court's constitutional concerns appear to be substantially at odds with its earlier jurisprudence. In *Great N. Ry. Co. v. Sunburst Oil and Ref. Co.,* 287 U.S. 358, 364–65, 53 S.Ct. 145, 77 L.Ed. 360 (1932), the Supreme Court stated:

> We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law nonetheless for

intermediate transactions…. On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning.

In *Mendes, supra,* relying on *Sunburst Oil,* this court deemed itself free to adopt whatever rules it chose on the subject of retroactivity. 389 A.2d at 788.

articulated in *Linkletter*. Indeed, we think it probable that if *Beam* and *Harper*, and not *Linkletter*, had reflected the Supreme Court's jurisprudence in 1978, this court would have given its decision in *Mendes* full retroactive effect.

Nevertheless, "[t]his court will not lightly deem one of its decisions to have been implicitly overruled and thus stripped of its precedential authority." *Lee v. United States*, 668 A.2d 822, 828 (D.C.1995). As a two-judge majority of a three-judge panel, we are especially reluctant to take such a step, although it may well be desirable for the en banc court to revisit *Mendes* in light of arguably supervening developments during the past two decades. In any event, we think it unnecessary to decide whether *Mendes* has survived *Beam* and *Harper* because, even if it has, then under the *Mendes* standards, reasonably construed, our decision in *Carl II* must be retroactively applied to the present case.[6]

### D. *The Mendes factors.*

We now consider each of the *Mendes* factors, in the order that they were enumerated by the court in that case.

#### (1) *Reliance.*

We stated in *Mendes* that "[t]he degree of the reliance by the litigants before the court, and in some cases by the public at large, on the legitimacy of the prior rule has played a major role in courts' analysis of the retroactivity issue." 389 A.2d at 789. The court thus focused both on reliance *in fact* (by the parties before the court) and on the right of the public, including other potential litigants, to rely on the previous rule.[7] The reliance inquiry is, of course, directed to Guest Services' reasonable expectations at the time of Ms. Washington's dismissal, and not to counsel's subsequent formulations during the course of litigation.

In the present case, Guest Services' own submission to the trial court belies any notion that it discharged Ms. Washington in actual reliance on prior law as reflected in *Adams, supra*.[8] Guest Services represented to the court that Ms. Washington was terminated for rudeness, hysterical conduct, and insubordination. If these were the actual reasons for Ms. Washington's discharge, then no "public policy" exception to the at-will doctrine was implicated, for it is undisputed that Guest Services would have had the right to fire Ms. Washington on the stated grounds even under *Carl II* standards.[9]

---

**6.** In at least two cases decided after *Beam* and *Harper*, this court has cited and followed the Supreme Court's retroactivity analysis as articulated in those decisions. *See White v. Hairston*, 698 A.2d 471, 473 n. 4 (D.C.1997); *Sprint Communications Co. v. Kelly*, 642 A.2d 106, 117 (D.C. 1994), *cert. denied*, 513 U.S. 916, 115 S.Ct. 294, 130 L.Ed.2d 208 (1995). In *White*, however, we also focused on the lack of any "reliance interest" by any party on the old law, an irrelevant consideration under the *Beam* and *Harper* analysis. *Sprint Communications* presented a federal constitutional question, and *Beam* and *Harper* were therefore binding on the court. There was no discussion, either in *White* or in *Sprint Communications*, of the interplay between *Harper* and *Mendes*, and the judicial mind did not pass in those cases on the issue here presented. *Cf. District of Columbia v. Sierra Club*, 670 A.2d 354, 360 (D.C.1996). The question whether *Mendes'* retroactivity analysis remains viable after *Beam* and *Harper* therefore remains an open one.

**7.** *See also Harper, supra*, 509 U.S. at 95 & n. 9, 113 S.Ct. 2510 (characterizing one question under the prior law as being whether litigants *"actually* relied on an old rule.)" (Emphasis added) (citation and internal quotation marks omitted).

**8.** In our order in *Washington I*, we asked counsel to state their views as whether a remand to the trial court was necessary or appropriate in connection with the determination whether *Carl II* applies to this appeal. Guest Services did not request a remand, and thus made no request for an opportunity to demonstrate that it actually relied on prior law in making its decision to fire Ms. Washington.

**9.** It is theoretically possible, of course, that Guest Services, while adhering to its own view of the facts, could nevertheless have believed, on the basis of prior law, that Ms. Washington's contrary version of the facts, though untrue according to Guest Services, would not support a claim for wrongful termination. Any such theoretical possibility would presuppose, however, that at the time the decision to discharge Ms. Washington was made, Guest Services knew that Ms. Washington would fabricate a false story. Moreover, Guest Services could not have relied on the legal inadequacy of Ms. Washington's allegedly fabricated version unless it was able to determine, in advance of Ms. Washington's dismissal, just what that false story would be. In any event, Guest Services has not claimed that it acted pursuant to such an improbable scenario.

We turn next to the other aspect of the reliance inquiry, namely, whether employers and the general public relied, or could reasonably have relied, on the proposition that *Adams* represented, and would continue to represent, the sole public policy exception to the employment at-will doctrine. The question, as we see it, is whether the pre-*Carl II* standard was so deeply ingrained in the law that it would be unreasonable to apply *Carl II* retroactively even as to employers who have failed to demonstrate reliance in fact on prior case law.

Guest Services contends that, at the time Ms. Washington was discharged, an attorney could properly have advised his or her client, with reasonable certainty, that, if the facts were as Ms. Washington alleged them to be, then at that time, the client had no reason to fear liability for wrongful discharge. But in any case in which retroactive application is sought, the defendant's conduct would always have been lawful under previously applicable precedent. Indeed, in *Mendes*, the landlord was held liable for damages even though, as the court noted, he reasonably "might have assumed, on the basis of prior case law, that his conduct was permissible." *Mendes, supra,* 389 A.2d at 793.

This is not a case in which the prior state of the law was so clear as to provide Guest Services with reasonable assurance that its discharge of Ms. Washington would not give rise to liability. As a majority of the en banc court recognized in *Carl II, supra,* 702 A.2d at 160,

> [w]e could not and did not hold in *Adams* that [the exception recognized by the court in that case] was the *only* public policy exception, because that question was simply not presented.

(Emphasis in original) (citations and internal quotation marks omitted).[10] Indeed, the jurisprudence of wrongful termination was uncertain in 1994, when Ms. Washington was terminated by Guest Services, and remains somewhat fluid today. In recent years, as the courts have developed the "emerging doctrinal basis for the public policy exception," *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 113 (Colo.1992), the at-will doctrine has been "undergoing considerable erosion." *Boudar v. Buenette,* 106 N.M. 279, 742 P.2d 491, 494 (1987) (en banc). To paraphrase the Supreme Court of California, "[e]ven if one views [*Carl II*] as breaking new and unexpected ground, a point we do not concede, it did so in an indisputably unsettled area." *Newman v. Emerson Radio Corp.,* 48 Cal.3d 973, 258 Cal.Rptr. 592, 772 P.2d 1059, 1068 (1989).[11]

By the time Guest Services discharged Ms. Washington, the "public policy" exception to the at-will doctrine had been widely applied in other jurisdictions to categories of conduct similar to that in which Ms. Washington claims to have engaged. *See generally* 82 AM.JUR.2D *Wrongful Discharge* § 15, at 688 (1992) (explaining that "the courts generally protect three categories of protected employee conduct: (1) exercising a statutory right or civil obligation; (2) refusing to engage in illegal activity; [and] (3) reporting criminal conduct to supervisors or outside agencies").

The District of Columbia was not insulated from this trend. In 1992, two years before the events giving rise to this appeal, this court had agreed to consider a "public policy exception" case en banc, but had subsequently aborted the venture. *See Gray, supra* note 10. It was therefore reasonably fore-

---

**10.** Prior to our en banc decision in *Carl II,* two divisions of this court had taken the position that *Adams* represented the sole exception in this jurisdiction to the employment at-will doctrine. *See Gray v. Citizens Bank of Wash.,* 602 A.2d 1096, 1097 (D.C.), *vacated, id.* at 1102, *opinion reinstated on denial of rehearing en banc,* 609 A.2d 1143 (D.C.1992); *Thigpen v. Greenpeace, Inc.,* 657 A.2d 770, 771 (D.C.1995). But *Thigpen* was decided after Ms. Washington was discharged, and Guest Services could not have relied on it. The problems inherent in reliance on

the division opinion in *Gray* are discussed *infra* at page 1077–78.

**11.** In this respect, the present case differs from *Mendes.* The right to use self-help to evict a non-paying tenant either exists or does not exist; there is no middle ground. In *Mendes,* prior doctrine had to be either overruled or retained. In the "public policy exception" area, on the other hand, protection for employees has advanced in incremental stages, so that the course of the law has been somewhat fluid and more difficult to predict.

seeable that the en banc court might look at the issue again.[12] Finally, the Supreme Court's decisions in *Beam* and *Harper*, considered in conjunction with *Mendes* and the virtually unanimous holdings of the courts of other jurisdictions in wrongful termination cases, see Part II.E, *infra*, arguably gave employers fair warning that any expansion of the public policy exception which this court might elect to undertake could well receive retroactive application.

To summarize, Guest Services has demonstrated neither that it actually relied on prior law nor that, if it had, such hypothetical reliance would have been reasonable. In our view, therefore, the first *Mendes* factor tilts in Ms. Washington's favor.

(2) *Avoidance of altering vested contract or property rights.*

"In conjunction with the reliance factor, courts also weigh the probable effect of a law change on the vested property or contract rights of the parties." *Mendes, supra*, 389 A.2d at 790. Guest Services has cited no authority, however, and we know of none, for the proposition that it had a "vested" right to discharge Ms. Washington.[13] As we have demonstrated in our discussion of *Mendes'* "reliance prong," Guest Services' assertion that the dismissal of Ms. Washington was lawful was cast in doubt by readily discernable uncertainty as to the future course of a developing area of the law.

Guest Services may have had a subjective expectation that no further exception to the at-will doctrine would become applicable to Guest Services' conduct. Such an expectation may even have stemmed from a plausible predictive assessment of how the law would develop in the District of Columbia. Plausibility is not enough, however, to create the kind of vested right that a court should take care not to impair. The application of *Carl II* to this appeal will not deprive Guest Services of any legally cognizable vested right.

(3) *Rewards to plaintiffs who seek to change the law.*

Ms. Washington did not bring this action to effect a change in the law. On the contrary, her counsel has maintained, erroneously in our view, that she is entitled to prevail under the law in effect prior to our decision in *Carl II*. *Mendes'* "reward" factor does not weigh in favor of retroactive application of *Carl II* to Ms. Washington.

(4) *Fear of burdening the administration of justice with retroactive changes in the law.*

In connection with the fourth *Mendes* factor, Guest Services asserts that "[a] full retroactive change would open the floodgates of litigation based on wrongful discharge." We do not find this contention persuasive.

If "floodgates" were going to open in the wrongful termination area, this would surely have happened as a result of the *Carl II* decision itself, and not on account of a ruling applying *Carl II* retroactively to the limited number of potential litigants whose claims are not barred by the three-year statute of limitations. *See* D.C.Code §§ 12–301(7)–(8) (1995).

In any event, "the flood of litigation argument is nothing more that an unarticulated fear of the mythological Pandora's box. ..." Note, *Protecting At–Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 HARV.L.REV. 1816, 1842 n. 146 (1980) (quoting *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 182 (1974) (Roberts, J., dissenting)).[14] Our en banc court emphatically re-

---

**12.** *Cf. Gray, supra* note 10, 602 A.2d at 1099 (Schwelb, J., concurring) ("Our progressive capital ought not to be left behind").

**13.** In *Kelly Adjustment Co. v. Boyd*, 342 A.2d 361, 362–63 (D.C.1975), the sole authority cited by Guest Services on this issue (other than *Carl II*), this court held that its earlier decision invalidating certain process-serving practices of collection agencies would not be retroactively applied to cases which had been reduced to judgment, regardless of whether they were on appeal. As the court pointed out in *Mendes*, retroactive application in *Kelly Adjustment* of the new rule there adopted "would have rendered unenforceable a mass of final judgments." *Mendes*, 389 A.2d at 792 n. 25. In the present case, the appeal was still pending at the time *Carl II* was decided, and the rationale of *Kelly Adjustment* has no application.

**14.** In *Geary*, the majority also stated that an increased case load and the inevitable "thorny problems of proof ... do not in themselves justi-

jected an identical contention in *Williams v. Baker*, 572 A.2d 1062, 1067–68 (D.C.1990) (en banc). Dean Prosser said it well many years ago:

> It is the business of the law to remedy wrongs that deserve it, even at the expense of a "flood of litigation"; and it is a pitiful confession of incompetence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do.

Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 MICH.L.REV. 874 (1939);[15] *see also* W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS, § 12, at 56 (5th ed.1984) (paraphrasing and elaborating on Prosser's earlier discussion).

In *Mendes*, the court also gave consideration to the question whether retroactive application of its decision would require the relitigation of cases already decided under prior law. 389 A.2d at 792 n. 25. Nothing in this opinion, however, contemplates the application of the new *Carl II* standard in cases which have come to final judgment and in which all direct appeals have been exhausted. *See, e.g., Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir.1993) (after appeals have been exhausted, final judgment will not be reopened on basis of change in decisional law). There is no evidence that a substantial number of appeals now pending potentially present the question whether *Carl II* is to be applied retroactively, and the handful of cases in that category would not significantly burden our courts.

## E. *Decisions in other jurisdictions.*

Although there is no dispositive District of Columbia precedent, case law in other jurisdictions overwhelmingly supports our conclusion that decisions recognizing or expanding the public policy exception to the at-will doctrine should be retroactively applied. *See, e.g., Bernstein v. Aetna Life & Cas.*, 843 F.2d 359, 363–64 (9th Cir.1988) (applying Arizona

law); *Martin Marietta Corp., supra*, 823 P.2d at 110–14 (Supreme Court of Colorado); *Newman, supra*, 258 Cal.Rptr. 592, 772 P.2d at 1062–72 (Supreme Court of California); *McGehee v. Florafax Int'l, Inc.*, 776 P.2d 852, 853–54 (Okl.1989) (Supreme Court of Oklahoma); *Barnes v. Chase Instruments Corp.*, 1986 WL 6616, 1986 Tenn. Lexis 3068 (Tenn. App.1986); *but cf. Bimbo v. Burdette Tomlin Mem. Hosp.*, 644 F.Supp. 1033, 1039–40 (D.N.J.1986). Most of these cases were decided before *Beam* and *Harper*, but the courts nevertheless held that retroactive application was appropriate under the Supreme Court's prior jurisprudence, as reflected in *Linkletter, supra*, and *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). We agree with the following analysis of the issue, on different but comparable facts, by the Supreme Court of Oklahoma:

> Unfairness and undue hardship would be imposed upon discharged employees by a merely prospective application of the *Burk* decision.[16] Appellant would be deprived of an actionable tort claim for his employer's alleged violation of a clear expression of public policy found in the perjury statute. [Statutory citation omitted.] In contrast, no inequity will result from the retroactive application of *Burk*. Employers accused of violating clear expressions of public policy cannot be said to have justifiably relied on the employment-at-will doctrine.

> Nor will appellees in this action be substantially harmed by being forced, at a new trial, to present evidence that appellant's discharge was motivated by poor employee performance rather than his refusal to sign false small claims affidavits. Appellees' claim of "good-faith reliance" on the employment-at-will doctrine cannot justify its alleged tortious firing for an employee's refusal to commit a crime. No "manifest injustice" will result from requir-

---

fy denying a legal forum to a plaintiff with a justiciable claim." 319 A.2d at 179.

**15.** Prosser's assessment has been quoted and adopted by the courts on numerous occasions. *See, e.g., Niederman v. Brodsky*, 436 Pa. 401, 261 A.2d 84, 89 (1970); *Tanner v. Rite Aid of W.Va.,*

*Inc.*, 194 W.Va. 643, 461 S.E.2d 149, 157 n. 12 (1995).

**16.** *Burk v. K–Mart Corp.*, 770 P.2d 24 (Okl.1989) (articulating a limited public policy exception to the at-will employment doctrine).

ing appellees to defend against appellant's claim.

*McGehee, supra,* 776 P.2d at 854.

 \* \* \* \* \* \*

After considering all of the *Mendes* factors and the authorities in other jurisdictions, we conclude that the *Carl II* decision should be applied to Ms. Washington in this case.

## III.

### THE APPLICATION OF *CARL II* TO THE PRESENT RECORD

We now turn to the question whether the order granting summary judgment in favor of Guest Services can continue to stand if we apply the en banc court's subsequent decision in *Carl II.* We conclude that it cannot.

Linda Carl alleged in her complaint that Children's Hospital had discharged her from her position as a nurse because, *inter alia,* she had testified before the Council of the District of Columbia in opposition to tort reform legislation. The trial court dismissed her complaint on the ground that her allegations were insufficient to bring her case within what was then the sole declared public policy exception to the at-will doctrine, as articulated in *Adams.* A division of this court affirmed. *Carl v. Children's Hosp.,* 657 A.2d 286 (D.C.1995) (*Carl I*). The full court granted Ms. Carl's petition for rehearing en banc.

In support of her claim of wrongful termination, Ms. Carl placed her principal reliance on D.C.Code § 1–224 (1992). Section 1–224 makes it a criminal offense "corruptly or by threat of force, or by any threatening letter or communication, [to] endeavor[ ] to influence, intimidate or impede any witness in any proceeding pending before the Council. . . ." Ms. Carl did not allege that Children's Hospital had threatened her or had otherwise violated the proscriptions of § 1–224, nor did she claim that the statute created a private right of action. Rather, Ms. Carl argued that her termination for testifying before the Council contravened a public policy exception to the at-will doctrine, and that it was therefore actionable. A majority of the en banc court held that Ms. Carl's complaint stated a claim upon which relief could be granted because it fell within a public policy "solidly based" on, or "firmly anchored" in, Section 1–224. *Carl II, supra,* 702 A.2d at 163–64 & n. 6 (Terry, J., concurring).

Our disposition of *Carl II* mandates reversal of the summary judgment in the present case. The health and food regulations which we have cited in footnote 1, *supra,* are expressions of a clear public policy proscribing, in the interest of public health, the preparation, service or sale of adulterated or contaminated food. Conduct that imperils the health and safety of the elderly residents of a retirement home, who, as a group, are particularly vulnerable to the kind of practice here alleged, is obviously contrary to the public policy of this jurisdiction, and Guest Services has not seriously argued the contrary.

Ms. Washington has alleged, under oath, that she was discharged for attempting to persuade her fellow worker (and, ultimately, her employer) not to violate this officially declared public policy and for protesting an alleged unsafe and unlawful practice. To permit an employee to be fired for such actions would undermine the purposes of the food and health regulations and would frustrate the public policy of which these regulations are an expression. If a cook who attempts to prevent the contamination of the food that she is preparing can lose her job for "insubordination," then similarly situated employees are likely to be coerced into silence, and the safety of the food will be compromised. Indeed, in the present case, the supervisor's intervention, if it occurred as Ms. Washington claims, had the immediate potential consequence of permitting Tyrica Martin to continue to spray the residents' food with a poisonous cleaning fluid.[17] The relationship between Ms. Washington's discharge and the applicable public policy was thus closer in time and more palpable than in *Carl II.*

---

17. We cannot foresee what evidence will be presented at trial, but Guest Services has to date made no claim that the food which Ms. Martin allegedly sprayed was not, in fact, tainted or that it was removed from the meals to be served to residents of Friendship Terrace.

It may be, of course, that Ms. Washington's allegations will not be sustained at trial. On Guest Services' motion for summary judgment, however, we view the record in the light most favorable to Ms. Washington, and we must treat her sworn affidavit and deposition testimony as true. *See, e.g., Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991).[18] If the events occurred as Ms. Washington has alleged, then an impartial trier of fact could reasonably conclude that Ms. Washington was discharged for conduct protected by a public policy exception to the employment at-will doctrine, and that her termination was therefore wrongful.

## IV.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed. The case is remanded for further proceedings consistent with this opinion.

*So ordered.*

KING, Associate Judge, Retired, dissenting:

I disagree with the majority's decision to give retroactive application to this court's decision in *Carl v. Children's Hosp.,* 702 A.2d 159 (D.C.1997) (en banc) (*"Carl II"*). Because the circumstances of Washington's firing did not entitle her to relief under the narrow exception established in *Adams v. George W. Cochran & Co.,* 597 A.2d 28 (D.C. 1991), because her discharge came three years before *Carl II* was decided, and because the long-standing caselaw of this jurisdiction would not allow retroactive application of *Carl II* to Washington's case, I would affirm the grant of summary judgment in favor of Guest Services, Inc. Therefore, I dissent.

The majority correctly states the general rule that legislative enactments operate pro-

spectively while judicial decisions ordinarily are applied retroactively. *United States v. Security Indus. Bank,* 459 U.S. 70, 79, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). Here, the majority would give retroactive effect to *Carl II*—where the *en banc* court, wearing its legislative hat, enacted a rule of law establishing new substantive rights and obligations for the public at large—as if it were a garden-variety judicial ruling with a more narrow applicability. *See, e.g., Nimetz v. Cappadona,* 596 A.2d 603 (D.C.1991) (dealing with retroactive effect of a new rule requiring party to request a special verdict in a civil case in order to preserve certain issues on appeal). This flies in the face of *Mendes v. Johnson,* 389 A.2d 781 (D.C.1978) (en banc), the leading case in the District of Columbia on the retroactive application of holdings of this court creating new causes of action. In *Mendes,* we relied heavily on *Great Northern Railway Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932) (*"Sunburst"*), in which the Supreme Court articulated the three general approaches to retroactive application of a new rule of law (total retroactivity, partial retroactivity, or purely prospective application), and the four-factor test for deciding which of these approaches to adopt (extent of reliance on the old rule, alteration of vested contract or property rights, reward for initiating just changes in the law, and burden on the courts from decisions disturbed by the new rule). *Mendes, supra,* 389 A.2d at 789. The principles set out in *Sunburst* were further refined by the Supreme Court in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971) (*"Chevron"*). Under a *Sunburst/Chevron/Mendes* analysis, this court takes a flexible, case-by-case approach to the question of the retroactive application of a new court-made rule of law.

The majority principally relies upon *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) and *Harper v. Virginia Dep't of Taxation,*

---

18. Nothing in this opinion is intended to suggest that employees have the right to countermand, or to promote noncompliance with, those orders of their superiors with which they disagree. In the present case, however, Ms. Washington asserted that she was faced with an emergency situation. Viewing Ms. Washington's account in the light

most favorable to her, she had no time to approach her supervisor to ask him to intervene. The food was already being contaminated when she spoke directly to Ms. Martin, and the public policy under which she claims to have been acting could not be vindicated if there had been further delay.

509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("*Beam/Harper*"), where the Supreme Court created a new rule of automatic retroactive application in all cases still open on direct review. *Harper, supra,* 509 U.S. at 97, 113 S.Ct. 2510. In each of those cases the Supreme Court was addressing the retroactivity of one of its prior rulings interpreting federal constitutional law. The Court emphasized, however, that the rule set forth in *Beam/Harper* was not binding on state courts and that "state courts may ... limit the retroactive application of their own interpretations of state law...." *Id.* at 100, 113 S.Ct. 2510.[1]

Neither *Beam* nor *Harper* purports to apply to the circumstances here. Therefore, I am satisfied that this division is not obligated to follow the *Beam/Harper* automatic retroactivity rule in cases involving *non-federal* law, particularly where the District, through its courts, has created new common law rights as an exercise of its powers as a "state." When creating such rights, as we did in *Carl II,* we should be free to determine the degree, if any, of the retroactive application of the new rule. Surely, we are best able to determine the effect a new rule would have upon the parties appearing before this court, weighing the factors considered in *Mendes.* In short, the more flexible, case-by-case analysis of *Sunburst/Chevron* is more appropriate for these purposes than the automatic retroactivity rule of *Beam/Harper.*

I also disagree with the majority's intimation that our holding in *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), does not necessarily require it to apply the rule laid down in *Mendes.* In my view the *Mendes* rule can be replaced by the non-binding holding of *Beam/Harper* only by the *en banc* court, not a division of the court. I am unpersuaded by the majority's suggestion that *M.A.P.* may not apply here because the philosophical basis for the prior ruling, *i.e., Mendes,* has been substantially undermined by subsequent Supreme Court decisions. *See Frendak v. United States,* 408 A.2d 364, 379 n. 27 (D.C. 1979). As I have observed above, the *Mendes* court relied principally upon the *Sunburst* line of cases, which we have recognized as authoritative in opinions post-dating *Beam.*[2] Moreover, we have applied the *Mendes* rule on at least four occasions since *Beam* was decided.[3] In *Beam/Harper,* the Supreme Court rejected the analysis of *Sunburst/Chevron* in retroactivity determinations for federal constitutional rulings, but the Court did not formally overrule those cases. Nor did the Court suggest that the principles underlying *Sunburst/Chevron* were unsound for purposes of state court retroactivity analysis. Therefore, I am satisfied that we remain bound by the holding in *Mendes.*

Finally, I also disagree with the majority's application of the *Mendes* factors. First, both parties in this case relied exclusively, and justifiably, on the rule established in *Adams.*[4] Retroactive application of *Carl II* would undermine the reliance and expectations of the parties. *See French, supra* note 3, 658 A.2d at 1031–32 (holding that new rule applied purely prospectively, primarily because of reliance factor). Second, because the previous law concerning the right of the employer to fire an at-will employee was clear-cut and generally understood in the workplace, *see Nickens v. Labor Agency of Metro. Washington,* 600 A.2d 813 (D.C.1991), retroactive application of *Carl II* would have

---

1. As with other state appellate courts, this court does not always follow the holdings of the Supreme Court. For example, we do not apply federal mootness principles. *Compare Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982), *with McClain v. United States,* 601 A.2d 80, 82 (D.C.1992).

2. *See, e.g., Robinson v. Washington Internal Med. Assocs.,* 647 A.2d 1140, 1146 (D.C.1994) (opinion by King, J.); *First Sav. Bank of Virginia v. Barclays Bank, S.A.,* 618 A.2d 134, 140 n. 19 (D.C. 1992); *Simpson v. District of Columbia Office of Human Rights,* 597 A.2d 392 (D.C.1991); *Nimetz, supra,* 596 A.2d at 608.

3. *See Chase v. District of Columbia Alcoholic Beverage Control Bd.,* 669 A.2d 1264, 1270 (D.C. 1995); *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 934 n. 6 (D.C.1995); *French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023, 1025, 1032 (D.C.1995); *Sanders v. Sanders,* 602 A.2d 663, 667 (D.C.1992).

4. Indeed, Washington did not argue that the rule of *Carl II* should apply in her case until we ordered, after the case was submitted, that the parties brief the issue.

a significant effect upon vested contract and property rights. Third, Washington did not seek to "initiate just changes in the law," *Mendes, supra,* 389 A.2d at 789; that was the course taken by Carl, and Carl's efforts were rewarded by applying the new rule in her case. Finally, we would expect that the burden on our courts would increase were *Carl II* given retroactive effect, with the outcome in seemingly resolved cases thrown into question and still-pending cases delayed by amended pleadings, expanded discovery, and new or revised motions being filed. In sum, each of the factors in the *Sunburst/Chevron/Mendes* retroactivity analysis operates against giving retroactive effect to *Carl II* except for Carl herself. Therefore, I would not apply the rule set forth in *Carl II* to the facts of this case.