**J. Michael FINGERHUT, Appellant,**

v.

**CHILDREN'S NATIONAL MEDICAL CENTER, Appellee.**

No. 95–CV–939.

District of Columbia Court of Appeals.

Argued Jan. 6, 1999.

Decided Oct. 7, 1999.

---

John F. Karl, Washington, DC, for appellant. Abbey G. Hairston, Washington, DC, and Adrian V. Nelson, II, Rockville, MD, were on the brief for appellant.

Robert L. Duston, with whom Ira M. Shepard, Washington, DC, was on the brief for appellee.

Before SCHWELB and REID, Associate Judges, and KERN, Senior Judge.

REID, Associate Judge:

This case involves a challenge to the dismissal of appellant J. Michael Fingerhut's wrongful discharge action against appellee Children's National Medical Center ("CNMC"). The motions court granted appellee's motion to dismiss the complaint under Super. Ct. Civ. R. 12(b)(6). On appeal, Fingerhut contended that he made a sufficient showing to withstand the dismissal of his wrongful discharge claim which alleged a violation of a public policy exception to the employment at-will doctrine. After our decision in *Carl v. Children's Hosp.*, 702 A.2d 159 (D.C.1997) (en banc), we asked the parties to file supplemental briefs. In his supplemental brief, Fingerhut maintains that he should prevail either under *Carl* or *Adams v. George W. Cochran & Co., Inc.*, 597 A.2d 28 (D.C. 1991). We conclude that the motions court erred in dismissing Fingerhut's wrongful discharge claim because, under *Carl*, his claim is sufficient to survive a Rule 12(b)(6) motion. Accordingly, we reverse and remand the case with instructions to reinstate Fingerhut's wrongful discharge claim.

## FACTUAL SUMMARY

Based upon allegations in Fingerhut's complaint and the pleadings pertaining to CNMC's motion to dismiss, the record shows the following. From about November 1989 to July 1993, Fingerhut was employed with CNMC as the Director of Security. Throughout this period, he received "satisfactory to excellent" performance evaluations and a number of commendations from CNMC management. He was never advised that his work was unsatisfactory. Fingerhut also enjoyed the status of a "Commissioned Special Police Officer" while working for CNMC.[1]

---

1. D.C.Code § 4–114 (1994) states:

 The Mayor of the District of Columbia, on application of any corporation or individual, or in his own discretion, may appoint special policeman for duty in connection with the property of, or under the charge of, such corporation or individual; said special policeman to be paid wholly by the corporation or person on whose account their appointments are made, and to be subject to such general regulations as the Council of the District of Columbia may prescribe.

In 1992, CNMC was awarded a federal construction grant that required the hiring of a minority contractor. CNMC wanted to use Hyman Construction, a non-minority contractor, but could only do so with a waiver from the District of Columbia Minority Business Opportunity Commission ("MBOC"). On March 20, 1992, Ron Tobin, the Vice President of Facilities Engineering for CNMC, informed Fingerhut of the construction grant. He explained to Fingerhut that he wished to bribe Moses Anamashune, an official of the MBOC, with computer equipment in order to obtain the necessary waiver to use Hyman Construction. Tobin feared that Anamashune would not grant the waiver, even after accepting the bribe. For this reason, Tobin asked Fingerhut to videotape the transaction using security cameras. Fingerhut expressed concern over the entire undertaking and asked Tobin to reconsider the bribe. Tobin declared that if Fingerhut did not agree to videotape the transaction, he would find another person who would, prompting Fingerhut to agree to videotape the exchange. Tobin asked Joseph Jardina, the Director of Purchasing at CNMC, to handle the exchange and informed him that Fingerhut would be videotaping the transfer. Jardina transferred the computer equipment to Anamashune. Fingerhut taped the transaction and made copies of the tape, intending to give them to the proper authorities.

Shortly thereafter, Fingerhut met with a District of Columbia police lieutenant to discuss concerns regarding a "possible bribe" of a government official. The lieutenant referred Fingerhut to the FBI.

Fingerhut spoke to the FBI's Health Care Fraud Squad and the FBI Public Corruption Squad and gave them a copy of the videotape. Over the next few months, the FBI contacted Fingerhut approximately twice a week to request further information.

Between February and June of 1993, nearly a year after the incident, Fingerhut began to develop a relationship with Rick Paris, the Vice President of Human Resources for CNMC. In June 1993, Fingerhut informed Paris about the bribery scheme, his involvement in an ongoing FBI investigation, and the possibility that arrests might take place soon. Fingerhut was subsequently terminated on July 8, 1993. CNMC told Fingerhut that his termination was due to a reduction in force and that his position would no longer exist. Fingerhut later learned that the position did exist and had been filled by the Assistant Director of Security.

On April 6, 1995, Fingerhut filed a complaint against CNMC alleging: wrongful discharge based upon a public policy exception to the employment at-will doctrine; negligent supervision; and intentional infliction of emotional distress. On May 12, 1995, CNMC moved to dismiss all counts for failure to state a claim upon which relief can be granted, pursuant to Super. Ct. Civ. R. 12(b)(6). CNMC argued that Fingerhut had failed to allege the elements of a wrongful discharge claim based upon a public policy exception to the at-will doctrine. CNMC contended that Fingerhut was alleging a whistleblower claim which was not recognized in the District of Columbia.[2] Moreover, CNMC asserted that

---

2. On October 7, 1998, subsequent to the filing of Fingerhut's complaint, D.C. Law 12–160, the "Whistleblower Reinforcement Act of 1998," took effect. D.C.Code § 1–616.11 *et seq.* (1999). Section 1–616.13 specifies that: "A supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order." A "protected disclosure" includes:

(6) ... any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences:

....

(D) A violation of a federal, state, or local law, rule or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature ....

D.C.Code § 1–616.12(a)(6)(D).

Fingerhut did not allege a valid claim under the *Adams, supra,* exception because he did not explicitly refuse an express request to assist in an illegal activity, and also because his silence would not have violated the law.

The motions court entered an order on June 20, 1995, dismissing the complaint without prejudice for the reasons argued by CNMC. On July 21, 1995, Fingerhut noted an appeal challenging only the dismissal of his wrongful discharge claim.

## ANALYSIS

Fingerhut argues that his wrongful discharge claim should not have been dismissed because he was fired for refusing to violate certain District of Columbia statutes, and therefore, his complaint stated a claim within the *Adams* public policy exception to the employment at-will doctrine. More specifically, he contends that his termination resulted from his refusal to violate D.C.Code § 4–142,[3] as well as § 22–704.[4] Alternatively, Fingerhut maintains that his wrongful discharge claim falls under *Carl* because it is covered by District public policy firmly anchored in the following statutes: D.C.Code §§ 4–142, 22–704 and 4–175.[5]

In response, CNMC contends that: 1) Fingerhut fails to state a valid wrongful

**3.** D.C.Code § 4–142 (1981) states in relevant part: "If any member of the police force shall neglect making any arrest for an offense against the laws of the United States committed in his presence, he shall be deemed guilty of a misdemeanor and shall be punishable by imprisonment in the District Jail or Penitentiary not exceeding 2 years, or by a fine not exceeding $500."

**4.** D.C.Code § 22–704(a) (1996) provides:
Whosoever corruptly, directly or indirectly, gives any money, or other bribe, present, reward, promise, contract, obligation, or security for the payment of any money, present, reward, or thing of value to any ministerial, administrative, executive, or judicial officer of the District of Columbia, or any employee, or other person acting in any capacity for the District of Columbia, or any agency thereof, either before or after the officer, employee, or other person acting in any capacity for the District of Columbia is qualified, with intent to influence such official's action on any matter which is then pending, or may by law come or be brought before such official in such official's official capacity, or to cause such official to execute any of the powers in such official vested, or to perform any duties of such official required, with partiality or favor, or otherwise than is required by law, or in consideration that such official being authorized in the line of such official's duty to contract for any advertising or for the furnishing of any labor or material, shall directly or indirectly arrange to receive or shall receive, or shall withhold from the parties so contracted with, any portion of the contract price, whether that price be fixed by law or by agreement, or in consideration that such official has nominated or appointed any person to any office or exercised any power in such official vested, or performed any duty of such official required, with partiality or favor, or otherwise contrary to law; and whosoever, being such an official, shall receive any such money, bribe, present, or reward, promise, contract, obligation, or security, with intent or for the purpose or consideration aforesaid shall be deemed guilty of bribery and upon conviction thereof shall be punished by imprisonment for a term not less than 6 months nor more than 5 years.

**5.** D.C.Code § 4–175 states in relevant part:
It is unlawful for any private detective, or any member of the police force, or for any other person to compromise a felony or any other unlawful act, or to participate in, assent to, aid or assist any person suspected of crime to escape a full judicial examination by failing to give known facts or reasonable causes of suspicion, or withholding any information relative to the charge or suspicion from the proper judicial authorities; or in any manner to receive any money, property, favor or other compensation from, or on account of, any person arrested or subject to arrest for any crime or supposed crime; or to permit any such person to go at large without due effort to secure an investigation of such supposed crime. And for any violation of the provisions of this section, or either of them, such member of the police force, or private detective, or other person guilty thereof, shall be deemed as having compromised a felony, and shall be thereafter prohibited from acting as an officer of said police force, or as a private detective, and shall be prosecuted to the extent of the law for aiding criminals to escape the ends of justice.

discharge claim under *Adams* because *Adams* requires an outright refusal to violate a specific law, and neither implied requests to report illegal activities nor constructive refusals to violate the law is sufficient in stating a claim under *Adams;* 2) *Adams* does not recognize a whistleblower cause of action; 3) "[t]he decision in *Carl v. Children's Hosp.* does not change the scope of the claim under *Adams v. Cochran,* and this Court should affirm the dismissal of [Fingerhut's] claim premised on *Adams*"; and 4) this court should not adopt or expand the tort of wrongful discharge under *Carl* to embrace a whistleblower claim because Fingerhut has failed to identify a specific relevant statute which applies to this case, and because such an expansion is a legislative rather than a judicial responsibility.

*Standard of Review*

 In reviewing a motion to dismiss for failure to state a claim, "[t]he question whether the complaint states a claim upon which relief may be granted is one of law, and our review of the trial judge's disposition is therefore *de novo*." *Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 877 (D.C.1998) (citing *Abdullah v. Roach,* 668 A.2d 801, 804 (D.C. 1995)). "A pleading 'should not be dismissed for failure to state a claim unless it is beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief.'" *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The allegations in the complaint must be taken as true and construed in the light most favorable to the plaintiff and, if these allegations are sufficient, the case must not be dismissed even if the court doubts that the plaintiff will ultimately prevail." *Id.* (citing *Atkins v. Industrial Telecomms. Ass'n,* 660 A.2d 885, 887 (D.C.1995)). *See also*

*Freas v. Archer Servs.,* 716 A.2d 998, 999 (D.C.1998).

*The Adams and Carl Exceptions*

This court first recognized an intentional tort for wrongful discharge based upon a "very narrow" public policy exception to the at-will doctrine in *Adams. Carl, supra,* 702 A.2d at 162. *Adams* held that the exception applies "when the sole reason for the discharge is the employee's refusal to violate the law, as expressed in a statute or municipal regulation." *Adams, supra,* 597 A.2d at 34.[6]

We permitted further limited expansion of the public policy exception to the at-will doctrine in *Carl, supra,* when we held that: "[T]he 'very narrow exception' created in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." 702 A.2d at 160. Furthermore, we said in *Carl,* "We could not and did not hold in *Adams* that this was the *only* public policy exception, because that question was simply not presented.'" *Id.* (quoting *Gray v. Citizens Bank,* 602 A.2d 1096, 1098 (D.C.), *vacated* at 1102, *opinion reinstated on denial of rehearing en banc,* 609 A.2d 1143 (D.C.1992) (Schwelb, J., concurring). A majority in *Carl* left room for additional public policy exceptions to the at-will doctrine:

> Future requests to recognize [public policy] exceptions ... should be addressed only on a case-by-case basis. This court should consider seriously only those arguments that reflect a clear mandate of public policy—*i.e.*, those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed.[7]

6. Under the at-will employment doctrine, "'an employer may discharge an at-will employee at any time and for any reason, or for no reason at all.'" *Carl, supra,* 702 A.2d at 162 (quoting *Adams, supra,* 597 A.2d at 30).

7. The majority of the court also stated that "there must be a close fit between the policy thus declared and the conduct at issue in the allegedly wrongful termination," *Carl, supra,* 702 A.2d at 164, and that exceptions must be

*Id.* at 164 (footnote omitted). *Carl* was decided on September 23, 1997, but is applicable to this case. *See Washington v. Guest Servs.,* 718 A.2d 1071, 1080 (D.C. 1998) (the standard set forth in *Carl* applies retroactively to cases in which the termination complained of occurred prior to September 23, 1997.).

### The Statutory and Regulatory Provisions on Which Fingerhut Relies

At the time of Fingerhut's termination, he was the Director of Security for the Children's National Medical Center and a commissioned special police officer under D.C.Code § 4–114. See note 1, *infra.* Implementing regulations for special police officers appear at 6A DCMR Chapter 11 (1988). Section 1100.6 of these regulations states: "Special police officers ... shall be amenable to the rules laid down for the government of the Metropolitan Police Force insofar as those rules are applicable." [8]

Under § 4–114, "a special police officer's commission authorizes him or her to exercise arrest powers significantly broader than those of ordinary citizens or licensed security guards." *Woodward & Lothrop v. Hillary,* 598 A.2d 1142, 1144 n. 4 (D.C. 1991) (citing *Alston v. United States,* 518 A.2d 439, 440 n. 3 (D.C.1986)). In fact, a special police officer is imbued with " 'the same powers as a law enforcement officer to arrest without warrant for offenses committed within premises to which his jurisdiction extends, and may arrest outside the premises on fresh pursuit for of-

fenses committed on the premises.' " *Id.* (quoting D.C.Code § 23–582(a) (1989)). Fingerhut was a special police officer within the meaning of § 4–114 at the time of the incident which he claims led to his termination.

In addition to citing § 4–114, Fingerhut relies on three statutory provisions in support of his public policy exception argument: §§ 4–142, 22–704, and 4–175. Section 4–142 makes it unlawful for police officers to "neglect making any arrest." See note 3, *infra.* Section 22–704 concerns corrupt influence of public officials and prohibits the felony crime of bribery. See note 4, *infra.* Section 4–175 makes it unlawful to compromise a felony by, *inter alia,* failing to report or to secure an investigation of suspected criminal activity. See note 5, *infra.*

### Pertinent Factual Context

Fingerhut's complaint made the following pertinent allegations in paragraphs 9 and 11 through 15:

> [Fingerhut] expressed his concern over bribing a District of Columbia government official, and requested Mr. Tobin [CNMC's Vice President of Facilities Engineering] to reconsider the idea. Mr. Tobin replied that he would have someone else record the bribe if [Fingerhut] refused. [Fingerhut], fearing his job was in jeopardy if he refused, agreed to record the bribe.
>
> . . . .
>
> After the meeting with Mr. Tobin ... [Fingerhut] decided to make more than

"firmly anchored either in the Constitution or in a statute or regulation which clearly reflects the particular 'public policy' being relied upon." *Id.* at 162. In his concurring opinion, Judge Terry uses the phrase "firmly anchored," as well as "carefully tethered" and "solidly based" in describing the nexus between public policy and statute or regulation. These terms are meant to be synonymous. *Id.* at 164 n. 6.

**8.** This court defined the role of the special police officer in *United States v. Lima,* 424 A.2d 113 (D.C.1980). There, we stated:

The courts have distinguished actions of private security guards from those of commissioned or deputized special police officers for good reasons. Although both are privately employed with a duty to protect the property of their employer, the special police officer or deputized officer is commonly vested by the state with powers beyond that of an ordinary citizen. The District of Columbia special police officer ... has the same power of arrest within his jurisdiction as a Metropolitan Police Officer

. . . .

*Id.* at 119 (quotations and citation omitted).

one videotape with the intent to report the bribe to the appropriate law enforcement authorities.

... [Fingerhut] ... videotaped [the District government official] arriving at the loading dock; loading the computer into his vehicle ....

[Fingerhut] provided [CNMC] with a copy of the tape and retained other copies.

Shortly after the bribery incident occurred, [Fingerhut] met with a District of Columbia police lieutenant in CNMC's Cafeteria. [Fingerhut] discussed with the lieutenant his concerns about a possible bribe of a District of Columbia government official. The lieutenant recommended that [Fingerhut] report the incident to the federal law enforcement authorities.

[Fingerhut] contacted the FBI's Health Care Fraud Squad and the FBI's Public Corruption Squad. [Fingerhut] told the FBI what he discussed with [CNMC's] agents and employees and his observations and provided one of the videotapes. Over the next few months, the FBI contacted [Fingerhut] approximately twice a week requesting information about various CNMC officials.

Fingerhut further alleged that between February 1993 and June 1993, he alerted CNMC's Vice President of Human Resources "that CNMC's upper management had engaged in criminal behavior, and that he expected that arrests would occur in the future." Moreover, in June 1993, Fingerhut told CNMC's Vice President of Human Resources about the bribery incident; that he had informed the FBI, and that the FBI was conducting an ongoing investigation. Fingerhut was terminated on July 8, 1993, for the stated reason of a reduction in force. However, Fingerhut's position as Director of Security later was filled by the Assistant Director of Security.

Taking these factual allegations as true, as we must in this Rule 12(b)(6) case, we conclude that at this stage of the litigation the complaint sufficiently alleges Finger-hut engaged in investigative police work, during and after the alleged bribe, by making extra copies of the videotape, contacting the Metropolitan Police Department and the FBI to report the bribe, providing a copy of the videotape to the FBI, and responding to inquiries from the FBI. Further, the complaint alleges that Fingerhut was terminated after informing CNMC of pending arrests and his role in the FBI investigation.

*Application of Carl*

Fingerhut claims that his complaint satisfies *Adams, supra;* CNMC maintains that the complaint is insufficient under *Adams.* We need not decide whether Fingerhut has stated a cause of action under *Adams* because we are satisfied that his complaint states a claim under *Carl, supra,* where we said:

[I]n determining whether a public policy exception to the at-will doctrine applies to this case, we need only decide whether the alleged firing because Ms. Carl testified before the Council is sufficiently within the scope of the policy [against 'injur[ing]' a witness in [her] person or property'] embodied in [D.C.Code § 1–224] so that a court may consider imposing liability on Children's Hospital for Ms. Carl's termination for otherwise permissible reasons.

702 A.2d at 165 (Terry, J., concurring). "The alleged firing of Ms. Carl by Children's Hospital because she testified before the Council—an allegation which we must accept as true for the purposes of a Rule 12(b)(6) motion to dismiss—is not expressly prohibited by section 1–224 ...." *Id.* Nonetheless, section 1–224 "[spoke] with sufficient clarity to entitle Ms. Carl to proceed beyond a motion to dismiss her complaint under Rule 12(b)(6)" because "Section 1–224 [contains] a declaration of policy by the Council seeking to ensure the availability of information essential to its legislative function by imposing criminal penalties on anyone who seeks

to impede Council access to such information." *Id.*

Fingerhut relies on public policies imbedded in three statutory provisions to support his wrongful discharge claim under *Carl,* §§ 22–704, 4–142 and 4–175. Section 22–704 embodies a clear and longstanding declaration of policy by the Congress of the United States that corrupt influence, including bribery of government officials, is illegal and must be penalized. Section 22–704 "[is primarily] intended to permit the prosecution of those tendering money or other reward to executive, judicial or other officers of the government of the District of Columbia for the purpose of inducing the commission of a fraud." S.Rep. No. 74–1585, at 1 (1936).

Section 4–142 manifests a clear declaration of policy by the Congress, implemented by the District's regulatory policies, that District law enforcement agents must take action to enforce the laws of the United States including making arrests. *See Smith v. United States,* 122 U.S.App. D.C. 339, 341 n. 5, 353 F.2d 877, 879 n. 5 (1965); *South v. Maryland,* 59 U.S. (18 How.) 396, 403, 15 L.Ed. 433 (1856) (A duty to protect individuals from criminal conduct "is a public duty, for neglect of which the officer is amenable to the policy, and punishable by indictment only.").

Section 4–175, in pertinent part, makes it:

> [U]nlawful for ... any member of the police force ... to compromise a felony or any other unlawful act, ... by ... withholding any information relative to the charge or suspicion from the proper judicial authorities; ... or [by] permit[ting] any [person suspected of crime] to go at large without due effort to secure an investigation of such supposed crime.

This statutory provision reflects a clear legislative declaration of policy against a police officer concealing information pertaining to suspected illegal activity, or failing to take steps to ensure investigation of such activity.

In addition, as a Special Police Officer, Fingerhut was "amenable to the rules laid down for the government of the Metropolitan Police Force." 6A DCMR § 1100.6. "Members of the police force are 'held to be always on duty,' and are required to take police action when crimes are committed in their presence." *District of Columbia v. Coleman,* 667 A.2d 811, 818 n. 11 (D.C.1995) (quoting 6A DCMR § 200.4 (1988)). "Police action" includes reporting crimes, investigative work and formal arrests.[9]

■ As Judge Terry emphasized in *Carl, supra:*[10]

> This court should consider seriously only those arguments that reflect a clear mandate of public policy—*i.e.,* those that make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception is needed.

702 A.2d at 164 (footnote omitted) (Terry, J., concurring). We conclude that Fingerhut has made the requisite allegations under *Carl.* The three statutes on which he relies, §§ 4–142, 22–704 and 4–175, in concert with § 4–114 and its implementing regulations, "reflect a clear mandate of public policy" that has been declared in statute and regulation: a policy against the termination of a special police officer who records and reports a bribe of a government official, and who assists the FBI in the investigation of corrupt influence with respect to a federal government con-

---

9. The duties of a police officer include "the preservation of peace, the protection of life and property, the prevention of crime, and the arrest of violators of the law ...." 6A DCMR § 200.3.

10. As to the precedential significance of Judge Terry's concurring opinion in *Carl* (when considered in conjunction with Judge Steadman's dissenting opinion, 702 A.2d at 197 n. 2), *see Duncan v. Children's Nat'l Medical Ctr.,* 702 A.2d 207, 210 (D.C.1997).

struction grant. There is a "close fit," *Carl, supra,* 702 A.2d at 164, between this policy and CNMC's alleged decision not only to terminate Fingerhut after he informed CNMC of pending arrests and his role in the investigation of the bribe, but also to fill Fingerhut's position with the Assistant Director of Security even though the stated reason for Fingerhut's termination was a reduction in force. Indeed, as we said in *Guest Servs., supra,* "The relationship between [Fingerhut's] discharge and the applicable public policy was . . . closer in time and more palpable than in *Carl* . . . ." 718 A.2d at 1080.

█ Given the allegations in his complaint, Fingerhut may have been in a position similar to that of the police officer involved in *Monroe v. United States,* 98 U.S.App. D.C. 228, 234 F.2d 49 (1956). *Monroe* involved prosecutions under § 22–704. In discussing the role of the police officer, the court said:

> [The police officer] was entirely innocent of wrongdoing. In fact he uncovered the allegedly criminal conduct by permitting himself seemingly to participate therein, while at the same time reporting the unfolding events to his superior officers and assembling evidence in preparation for arrests.

*Monroe, supra,* 98 U.S.App. D.C. at 231, 234 F.2d at 52. Furthermore, even assuming that Fingerhut initially engaged in conduct that violated District policies, that "violation does not excuse [CNMC's] like failure, itself an independent violation of the public policy underlying the legal proscriptions, much less permit retaliatory discharges." *Liberatore v. Melville Corp.,* 335 U.S.App. D.C. 26, 32, 168 F.3d 1326, 1332 (1999).

In short, Fingerhut "is entitled to prove" a violation of the officially declared policy reflected in §§ 4–142, 22–704 and 4–175, "if [he] can, and therefore the dis-

missal of [his] complaint should be reversed." *Carl, supra,* 702 A.2d at 165.[11]

Accordingly, for the foregoing reasons we reverse the judgment of the trial court and remand this case with instructions to reinstate Fingerhut's wrongful discharge claim.

*So ordered.*

---

11. Given our disposition and the Council's recent enactment of whistleblower legislation, we do not reach the parties' arguments re-

garding a whistleblower's exception to the at-will doctrine.