**Lahar DAVIS, Tauhid Byrd, and Lisha Quarles, Appellants,**

v.

**COMMUNITY ALTERNATIVES OF WASHINGTON, D.C., INC., Appellee.**

**No. 11–CV–1497.**

District of Columbia Court of Appeals.

Argued April 11, 2013.
Decided Sept. 5, 2013.

Leslie D. Alderman III, Washington, DC, for appellant.

J. Michael Hannon, with whom Daniel S. Crowley, Washington, DC, was on the brief, for appellee.

Before FISHER and EASTERLY, Associate Judges, and SCHWELB, Senior Judge.

EASTERLY, Associate Judge:

Appellants Lisha Quarles and Kathie Byrd are former employees of Community Alternatives of Washington, D.C., Inc., which operates group homes that house adults with intellectual disabilities.[1] Con-

---

**1.** There have been some changes in parties and names since the inception of this case.

Ms. Byrd died while this appeal was pending. Her counsel filed a motion to substitute for

tending that they were discharged by Community Alternatives because of their complaints about client treatment and staff working conditions, Ms. Quarles, Ms. Byrd, and a third Community Alternatives employee, Michelle Monroe, filed suit, alleging that Community Alternatives was liable for the common law tort of wrongful discharge against public policy. The trial court initially granted summary judgment for Community Alternatives on the grounds that the common law claim was preempted by federal law and that the plaintiffs had failed to exhaust administrative remedies, but this court reversed and remanded with respect to Ms. Quarles and Ms. Byrd.[2] *Byrd v. VOCA Corp. of Washington, D.C.*, 962 A.2d 927, 929–30, 935–36 (D.C.2008) [hereinafter *Byrd I* ]. On remand, the case proceeded to trial, and at the close of Ms. Quarles' and Ms. Byrd's case-in-chief, the trial court granted Community Alternatives' motion for judgment as a matter of law, noting that neither plaintiff had established the requisite "close fit" between their conduct, a public policy, and their termination from Community Alternatives.[3] This appeal followed. We affirm.

Ms. Quarles and Ms. Byrd primarily challenge the trial court's ruling granting Community Alternatives judgment as a matter of law. We review this ruling *de novo* and employ the same standard used by the trial court: judgment as a matter of law is appropriate if, viewing the evidence in the light most favorable to the non-moving party, " 'no reasonable person … could reach a verdict in favor of that party.' " *Bean v. Gutierrez*, 980 A.2d 1090, 1093 (D.C.2009) (quoting *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 886–87 (D.C.2003) (en banc)).

■ We look first to the elements of the common law tort of wrongful discharge in violation of public policy, which creates a "very narrow" exception to the general rule that at-will employees[4] may be discharged at any time for any reason. *Carl v. Children's Hosp.*, 702 A.2d 159, 159–60 (D.C.1997) (en banc). In order to make out a claim, an employee must first identify either a public policy that this court has previously recognized or " 'make a clear showing, based on some identifiable policy that has been "officially declared" in a statute or municipal regulation, or in the Constitution, that a new exception [to the at-will doctrine] is needed.' " *Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803–04 (D.C.1999) (quoting *Carl*, 702 A.2d at 164 (Terry, J., concurring)). The employee must then show " 'a close fit between [that] policy … and the conduct at issue in the allegedly wrongful termi-

Ms. Byrd the personal representatives of Ms. Byrd's estate, Lahar Davis and Tauhid Byrd. Pursuant to D.C.App. R. 43(a), we grant the motion and amend the caption accordingly, but, for simplicity's sake, we refer to the arguments made by Ms. Byrd as her arguments.

Community Alternatives was known as VOCA Corporation of Washington, D.C., at the time it employed Ms. Quarles and Ms. Byrd. For consistency, we refer to "Community Alternatives" in this opinion.

2. This court affirmed the trial court's ruling that Ms. Monroe's claim was preempted. *Byrd v. VOCA Corp. of Washington, D.C.*, 962 A.2d 927, 929–30, 934–35 (D.C.2008).

3. Community Alternatives had argued in *Byrd I* that Ms. Quarles and Ms. Byrd could "show neither the clear mandate of public policy nor a close fit between any such policy and the conduct involved in the alleged wrongful termination," but this court determined that "we need not, and do not resolve these questions." *Id.* at 934.

4. Although the tort originally applied to at-will employees, this court held in *Byrd I* that it also applied to contract employees like Ms. Quarles and Ms. Byrd. 962 A.2d at 931–34; *see also infra* note 6.

nation.'" *Id.* at 803 n. 7 (quoting *Carl,* 702 A.2d at 164 (Terry, J., concurring)).[5]

Critically, we have repeatedly acknowledged the limited reach of this tort and indicated that a plaintiff seeking recovery thereunder must show that her protected activity was the predominant cause of her termination. *See Wallace v. Skadden, Arps, Slate, Meagher & Flom,* 715 A.2d 873, 886 (D.C.1998) (holding that "[i]t takes more than the plaintiff has alleged to invoke a 'public policy' exception to the at-will doctrine," and that plaintiff's wrongful termination claim failed where "[her] own complaint reveals that she was not terminated solely, or even substantially, for engaging in conduct protected by such an exception" (footnote omitted)); *see also Fingerhut,* 738 A.2d at 803–04 & n. 7 (noting that, under *Carl,* 702 A.2d at 164, the only claims that should be " 'consider[ed] seriously' " are those where there is " 'a close fit' " between the public policy and " 'the conduct at issue in the allegedly wrongful termination' ").

■■■■ It follows that the tort's limited application does not protect employees from termination for conduct that, to borrow a term from our unemployment compensation jurisprudence, would be akin to "gross misconduct." *Cf.* 7 DCMR § 312.4 (2013) (Gross misconduct includes "[i]nsubordination," "[r]epeated disregard of reasonable orders," "[u]nprovoked assault or threats," or "[t]heft or attempted theft."). In other words, whatever an employee is doing to promote a public policy interest, she is not immunized from getting fired if she is engaging in serious misbehavior on the job. *See Wallace,* 715 A.2d at 886 (noting the wrongful discharge tort was "not designed to prevent an employer from terminating an ... employee in order to eliminate unacceptable internal conflict and turmoil" and that "[a]n employer is not required to tolerate an intolerable working environment"). In light of these limitations on the tort, we hold that, even viewing the evidence that they presented at trial in a light most favorable to them, as we must, neither Ms. Quarles nor Ms. Byrd made the necessary showing to send her case to the jury.[6]

Both Ms. Quarles and Ms. Byrd argue that they acted in furtherance of the public policy of protecting people with disabilities residing in group homes from

---

5. *See, e.g., Fingerhut,* 738 A.2d at 803–07 (holding that plaintiff, director of security for a hospital, had sufficiently pled requisite public policy and a close fit where he asserted that a hospital fired him for reporting to law enforcement that a hospital administrator bribed a public official); *Washington v. Guest Servs., Inc.,* 718 A.2d 1071, 1080 (D.C.1998) (holding that plaintiff, cook at a nursing home, had sufficiently pled requisite public policy and a close fit where she alleged she was fired for expressing concerns that a fellow employee was contaminating the area where she was preparing food); *Freas v. Archer Servs., Inc.,* 716 A.2d 998, 999–1003 (D.C.1998) (holding that plaintiff had sufficiently pled requisite public policy and a close fit where he alleged that his company had fired him after he filed a statutorily authorized lawsuit meant to protect employees against employers who illegally deducted money from their paychecks).

6. On appeal, Community Alternatives argues that the wrongful discharge tort only applies to at-will employees and thus does not apply to Ms. Byrd or Ms. Quarles, who were both contract employees. *See, e.g., Carl,* 702 A.2d at 160 (noting that the tort creates "exceptions" to the at-will employment doctrine). We resolved this issue in *Byrd I,* however, expanding the doctrine to non-at-will employees. We observed that this expansion would " 'foster the State's interest in deterring particularly reprehensible conduct' " by employers and that the tort was rooted in "the employer's obligation to conduct its affairs in conformity with fundamental public policy." *Byrd I,* 962 A.2d at 934 (quoting *Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173, 1175 (1988)).

abuse and neglect. Ms. Quarles and Ms. Byrd point to a number of regulations that govern the care of adults with intellectual disabilities housed in group homes in the District. *See, e.g.,* 22–B DCMR ch. B35 (titled "Group Homes for Mentally Retarded Persons"). Assuming that these regulations manifest a general public policy on which they can base their common law claim, *see Fingerhut,* 738 A.2d at 803–04, Ms. Quarles runs into difficulty to the extent that she advocated for care above and beyond what the law requires. Ms. Quarles presented evidence that she sought an increase in the night-shift staffing at her facility, where Community Alternatives maintained a ratio of two workers for five adult residents. But the Municipal Regulations only require a minimum ratio of one worker per eight adults during nighttime hours. *See* 22–B DCMR § 3511.1(b) (2006) ("The minimum daily ratio of on-duty, direct care staff to residents ... shall be not less than ... 1:8 during sleeping hours.").

To the extent Ms. Quarles and Ms. Byrd both advocated more broadly for better treatment of group home residents, both women failed to demonstrate the requisite nexus between this protected conduct and their termination. They assert that Community Alternatives discharged them "in retaliation for making repeated complaints to their supervisors, the MRDDA, and D.C. City Council officials about the conditions of Community Alternatives' Group Homes ... and the neglect and abuse of ... [its] clients." But the evidence at trial established that these women were terminated for serious, job-related misbehavior: Ms. Quarles for falsifying her time and

getting paid for hours she had not worked, and Ms. Byrd for fighting with her co-workers. Indeed, Ms. Quarles and Ms. Byrd developed no evidence at trial to show that their protected conduct was in any way a factor in Community Alternatives' decisions to fire them.[7]

At trial, Ms. Quarles called as a witness on her behalf her supervisor, Ms. Loper–Clark. Ms. Loper–Clark provided the following undisputed narrative regarding Ms. Quarles' termination: the House Manager at the 50th Street group home where Ms. Quarles worked found a paystub of another 50th Street employee (uninvolved in the instant case) that reflected that that employee had been substantially overpaid; investigation of that employee led to an examination of Ms. Quarles' time records and an investigation of Ms. Quarles by Ms. Loper–Clark; Ms. Loper–Clark concluded that Ms. Quarles and the other 50th Street employee had falsified time and thus had stolen money from the company; Ms. Loper–Clark recommended to the Director of Human Resources, Renee Fairfax, that Ms. Quarles and the other employee be fired as a result of that conduct; and Ms. Fairfax fired Ms. Quarles and the other employee in accordance with Ms. Loper–Clark's recommendation. Ms. Loper–Clark further testified that she had no knowledge of Ms. Quarles' alleged protected conduct.

For her part, Ms. Quarles did not dispute that she had been paid for hours that she had not worked; she only disputed her culpability for her inaccurate time records. She testified without further explanation or corroboration that either she had been "framed" or the timekeeping system might have malfunctioned. But Ms. Quarles did

---

7. We agree with the concurrence that direct evidence is not required to establish the requirement of close fit, *see, e.g., Guest Services,* 718 A.2d at 1072–73, 1080, but, in the ab- sence of any evidence—direct or circumstantial—of close fit, that is not an issue in this case.

not offer any testimony or other evidence that challenged Ms. Loper–Clark's account of what had happened from a human-resources perspective and why Ms. Quarles had been terminated. In particular, Ms. Quarles did not dispute Ms. Loper–Clark's testimony that she had no knowledge of Ms. Quarles' alleged protected activity advocating for better treatment of adults housed in group homes in the District. Ms. Quarles testified only that she had sent a letter to Ms. Loper–Clark and Ms. Fairfax eighteen months before her termination addressing her concern that the night shift was understaffed. However, as we have noted above, Community Alternatives' nighttime staffing was within the regulated ratios and cannot be considered protected conduct under this narrowly defined tort.

Based on this evidence the trial court rightly concluded that Ms. Quarles had failed as a matter of law to demonstrate a close fit between her allegedly protected conduct and her termination. The record evidence reflects that she was terminated because Ms. Loper–Clark—ignorant of Ms. Quarles' alleged protected conduct— concluded that Ms. Quarles had falsified her time. Even if a juror could have reasonably concluded that Ms. Quarles was not in fact responsible for her inaccurate time sheets and that Community Alternatives should not have fired her on this basis, Ms. Quarles did not create a close fit between her alleged protected conduct and her termination. Had a jury believed that the time-keeping system had malfunctioned, evidence of retaliation by Ms. Loper–Clark or Ms. Fairfax—the only two people involved in Community Alternatives' termination decision—would still have been utterly lacking. Likewise, even if the jury had believed, simply based on Ms. Quarles' bare assertion of the possibility, that Ms. Quarles had been framed, there was no evidence that whoever participated in this framing did so in response to Ms. Quarles' protected conduct. Accord-

ingly, the trial court correctly ruled that Ms. Quarles could not submit her wrongful discharge claim to the jury.

Turning to the evidence regarding Ms. Byrd's termination, the undisputed record shows that she was discharged not as a result of alleged protected conduct but because of an incident with a fellow employee, Eric Parsons, at the group home where they both worked. This incident involved one or both of them cursing at each other in front of the home's residents. Six days later, the human resources department held a meeting to address the incident; this meeting was attended by Ms. Byrd and Mr. Parsons, as well as the home's supervisor, an additional supervisor, and Ms. Fairfax. At the meeting, both Ms. Byrd and Mr. Parsons were found in the wrong, and both were subsequently barred from working at that location.

Although Ms. Byrd admitted she had had a disagreement with Mr. Parsons, like Ms. Quarles, Ms. Byrd contested her culpability for the conduct that resulted in her termination. Ms. Byrd testified that Mr. Parsons was the aggressor and that only he had uttered curses. However, Ms. Byrd never testified or put on other evidence that she was fired for any reason other than fighting with Mr. Parsons. To the contrary, Ms. Byrd herself testified that Community Alternatives had barred her from working at her assigned group home because of the incident with Mr. Parsons, and she acknowledged that her eventual termination was directly tied to her subsequent inability to find a position at a different group home.

Based on this evidence, the trial court correctly determined that Ms. Byrd had also failed as a matter of law to demonstrate a close fit between her allegedly protected conduct and her termination. Even if a juror had credited Ms. Byrd's testimony and concluded that she was not equally culpable for the incident with Mr.

Parsons, there was still no evidence indicating that she was reassigned for a reason other than this incident, much less any evidence that her reassignment and subsequent termination was linked to her alleged protected conduct.

For the reasons set forth above, Ms. Quarles and Ms. Byrd failed to substantiate at trial a viable claim of the tort of wrongful discharge against public policy and the trial court properly granted judgment as a matter of law to Community Alternatives. Ms. Quarles and Ms. Byrd also challenge on appeal the trial court's ruling denying their motion to add Community Alternatives' parent company, Res–Care, Inc., as a defendant, and Ms. Byrd challenges the trial court's ruling excluding evidence that her supervisor was aware of her activity promoting public policy. In light of our determination that Community Alternatives was properly granted judgment as a matter of law, we conclude that Ms. Quarles and Ms. Byrd's challenge to the denial of their motion to add its parent company as a defendant to their suit is moot. *See Thorn v. Walker*, 912 A.2d 1192, 1195 (D.C.2006) (noting that an issue becomes moot when there is no cognizable interest in the outcome). Similarly, we decline to reach Ms. Byrd's argument that the trial court erroneously excluded evidence in support of her common law claim—namely that her supervisor had knowledge that she was engaging in activities furthering the public policy of protecting the home's residents. Even assuming this were true, this knowledge alone would not have demonstrated a close fit between those activities and Ms. Byrd's termination.

Accordingly, the judgment of the trial court is

*Affirmed.*

Concurring opinion by Senior Judge SCHWELB at page 713.

SCHWELB, Senior Judge, concurring:

I agree that the judgment should be affirmed, and for the most part, I am pleased to join Judge Easterly's well-crafted opinion for the court. I write separately, however, to observe that there are necessarily limits to our holding. As I understand it, we are not adopting a hard-and-fast rule that, as a matter of law, a former employee claiming to have been discharged in contravention of a public policy cannot have his or her case submitted to the jury for its consideration unless he or she is able to present direct evidence that the public policy has been violated and that the employer's claims of a benign motive are pretextual. It is with that understanding that I am "on board."

In many or most cases, the evidence that the employer discharged the employee for reasons proscribed by a recognized public policy is likely to be entirely circumstantial. Although, after thirty-four years on the bench following twenty-one years at the bar, I am no longer astonished by the frequency with which litigants pass up a golden opportunity to remain silent, the fact remains that in most cases, the employer will not be so imprudent as to admit a proscribed motivation to the complaining employee or to anyone sympathetic to the employee. Absent such an admission, the employee is not competent to testify about the workings of the employer's mind or, more specifically, as to the employer's motive for discharging him or her. In order to avoid judgment for the defendant as a matter of law, the employee will therefore have to prove his or her case by circumstantial evidence—*e.g.*, the nature and duration of the employee's allegedly protected conduct, the treatment of other similarly situated employees, and any inferences to be

drawn from the sequence of events. This evidence must be sufficient, when viewed in the light most favorable to the plaintiff, to overcome the employer's innocent explanation, if any, for the discharge and to permit an impartial jury, acting reasonably, to find in the employee's favor. I also emphasize that the employer's motive presents a question of fact, and that the jury is presumptively the body charged with ultimately determining whether the employee has satisfied his or her burden of establishing, inter alia, the pretextuality of the employer's version.

Further, proof that an employee violated the employer's rules is, of course, highly relevant, but it does not automatically warrant judgment as a matter of law in the employer's favor. A simple illustration demonstrates why this is necessarily so. Suppose that two employees, A and B, both have too much to drink, "screw up" on a single assignment, and behave in an obnoxious and disrespectful manner to their supervisor. However, A has previously engaged in conduct protected by a public policy, while B has not. A is then fired, while B is reprimanded but retained. Under these circumstances, notwithstanding his misconduct, a jury could reasonably find that A was discharged in violation of public policy. Put another way, perfect job performance cannot be required of those, but only of those, who are seeking public policy protection.

With that said, however, I unhesitatingly agree, for the reasons stated by Judge Easterly, with the affirmance of the judgment as to Ms. Quarles. The case of the late Ms. Byrd is a little more difficult, but given the record as a whole, I cannot say that my colleagues are wrong as to her either. I largely agree with the "close fit" analysis. Accordingly, I concur in the judgment and, subject to my comments above, join the opinion of the court.